In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3617

C.G. SCHMIDT, INC.,

*Plaintiff-Appellant*,

*v.*

PERMASTEELISA NORTH AMERICA,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 14-cv-01553 — **J.P. Stadtmueller**, *Judge*.

ARGUED APRIL 12, 2016 — DECIDED JUNE 16, 2016

Before WOOD, *Chief Judge*, and FLAUM and WILLIAMS, *Circuit Judges*.

FLAUM, *Circuit Judge*. Permasteelisa North America ("PNA"), a subcontractor, submitted a bid to C.G. Schmidt, Inc. ("CGS"), a general contractor, to provide a glass curtain-wall. CGS selected PNA's bid but after extensive negotiations, the parties did not enter into a formal subcontract. PNA backed out of the project at the last minute, requiring CGS to use a different subcontractor at a higher price.

CGS filed suit against PNA alleging breach of contract and promissory estoppel. The district court granted summary judgment to PNA, finding that the parties did not intend to be bound until the execution of a formal subcontract. We agree with the district court that the parties never entered into a binding contract and that CGS's promissory estoppel claim fails as a matter of law. Accordingly, we affirm the district court's grant of summary judgment.

## I. Background

CGS is a general contractor managing part of the construction of an eighteen-story office building at 833 East Michigan Street in Milwaukee, Wisconsin (the "project"). In April 2013, CGS solicited bids for a custom glass curtainwall—a nonstructural outer covering for weatherproofing and aesthetics. The curtainwall was one of the largest subcontracts of the nearly $52 million project. To facilitate the bidding process, CGS sent subcontractors, including PNA, a contract manual and a blank sample of CGS's standard subcontract. The contract manual stated that "[t]he bidder must accept all terms of the [standard CGS] subcontract as a condition for submitting a bid." The manual contemplated that the parties would eventually sign a formal subcontract. CGS's policy was to require written agreements for all subcontracts, including the curtainwall subcontract.

On April 19, 2013, PNA submitted a bid to construct and install the curtainwall for a total contract price of $12,675,421. PNA had its operations and legal departments review the bid materials and then submitted its bid using the bid form specified in CGS's contract manual. The bid form stated, in relevant part, that the bidder "proposes … to construct all work in the Work category" and "[i]n submitting and signing this

bid form, Bidder agrees with all terms and conditions of the standard [CGS] agreement forms." The bid included a base price, pricing schedule, alternate pricing, and a proposed scope for the project. PNA's Senior Vice President signed the bid.

Roughly two months later, CGS selected PNA as its "contractor of choice." The parties, however, were not prepared to execute a formal subcontract. CGS had not yet entered into two preliminary contracts with the project owner: (1) a prime contract, the overarching agreement with the project owner; and (2) a Guaranteed Maximum Price Amendment ("GMPA"), which sets the project's overall budget and creates a financial reserve to cover unexpected costs. CGS needed the GMPA in place before committing to pay PNA. PNA was also not prepared to sign a subcontract before these contracts were in place. PNA repeatedly expressed a need to review the finalized prime contract before it would execute a formal subcontract.

In addition, CGS and PNA did not execute a subcontract because they had not settled on the terms of the subcontract agreement. Over the next year, CGS and PNA engaged in a "value engineering process" during which they refined the price and other terms of the subcontract as they worked towards a final, signed agreement. PNA regularly updated the proposed contract price and communicated these updates to CGS. And on multiple occasions, PNA raised concerns with some of the terms of the subcontract. At no point during the negotiation process did CGS express to PNA that, in CGS's view, there was already an existing agreement in place.

From June 2013, when CGS selected PNA's bid, to June 2014, the parties stayed in communication while they prepared for construction and refined the terms of the subcontract. In September 2013, PNA requested a production schedule from CGS so that it could confirm a time slot with its manufacturing facility in Thailand. Importantly, use of the Thai facility allowed PNA to offer CGS a substantial credit or deduction towards the total subcontract price due to the cheaper cost of labor.

In late 2013 and early 2014, CGS asked PNA to move forward with certain engineering activities to keep the construction schedule on track. PNA responded that it needed a financial commitment in order to proceed. On February 25, 2014, CGS sent PNA an unsigned letter of intent, stating that "it is the intent of [CGS] and [PNA] to enter into a Subcontract agreement … ." The letter of intent contained an integration clause: "Upon execution of the Subcontract agreement between [CGS and PNA], the Subcontract and its Exhibits shall supersede in all respects prior negotiations between [CGS and PNA], including this letter of intent." It proposed a total contract price of $7,744,469 and a May 14, 2014 deadline for PNA to produce shop drawings.

PNA responded with its own proposed schedule "until a contract can be finalized." PNA's proposed schedule stated that it would not circulate shop drawings without an executed contract in place. PNA never produced any shop drawings.

On March 24, 2014, CGS and PNA, along with the project architect, operations, and engineering teams, convened for a

scheduled "kick-off" meeting. PNA admitted that the company's policy is not to participate in design kick-off meetings unless it is under contract.

On April 21, roughly one year after PNA submitted its initial bid, CGS and the project owner finally executed the prime contract. On May 16, PNA sent CGS an updated bid price.[1] On May 21, PNA requested a second letter of intent. CGS responded with a signed, revised letter of intent on May 23. The revised letter of intent contained the same basic terms and contract price as the previous letter of intent, but it added four alternate materials and pushed back deadlines.

On May 27, CGS entered into the GMPA with the project owner. CGS contends that in doing so, it relied on the price in PNA's May 16 bid. CGS alleges that PNA knew that CGS was relying on its bid.

Even after the GMPA was in place, CGS and PNA did not sign an executed agreement and continued to refine the terms of the subcontract. On May 29, PNA submitted an updated bid proposal with a total contract price of $8,047,368. That same day, CGS sent PNA a copy of the prime contract. PNA responded that it had remaining concerns with certain terms in the proposed subcontract, including the liquidated damages and delay damages provisions.

By June 2014, internal communications at CGS expressed urgency about getting the subcontract signed and the work

---

[1] This bid did not list a "total contract price," which includes the price of alternates. However, it did list a "total bid price" of $8,472,995, the same total bid price stated in PNA's final bid, submitted on May 29, 2014.

started. On June 5, CGS sent PNA a revised draft of the project scope and a total contract price of $7,824,529.67. On June 13, CGS sent PNA a proposed subcontract for electronic signature with a price term of $7,797,464. PNA did not respond. On June 16, CGS sent PNA a second proposed subcontract with a price term of $7,751,916.

Soon after, PNA abruptly "disengaged" from the project. PNA explained that because of civil unrest in Thailand, it no longer had the capacity to produce the curtainwall.[2] CGS urged PNA to honor its bid but PNA refused. The parties never signed a formal subcontract. Eventually, CGS replaced PNA with a different curtainwall subcontractor. CGS claims that it had to pay the replacement subcontractor a higher price and thus suffered damages.

On December 15, 2014, CGS filed a diversity action against PNA in the Eastern District of Wisconsin claiming breach of contract and promissory estoppel. CGS argued that PNA's bid constituted an offer, CGS's selection of that bid constituted an acceptance, and PNA breached the agreement by backing out. Alternatively, CGS argued that PNA's bid constituted a promise that induced CGS's reasonable reliance.

On August 3, 2015, PNA moved for summary judgment. On October 23, the district court granted summary judgment

---

[2] As it turns out, PNA had concerns about production capacity in Thailand as early as February 2014, when there was uncertainty about whether a key operations employee would be available. In May 2014, a martial law curfew went into effect in Thailand due to political unrest, which caused interruptions at the production facility. PNA did not notify CGS of these issues until disengagement.

to PNA. The district court held that the parties never manifested an intent to be bound; rather, CGS and PNA were negotiating towards a final written subcontract that never transpired. As for the promissory estoppel claim, the district court held that the bid did not constitute a promise and any reliance by CGS was unreasonable because the parties intended to be bound by a final written agreement. The court also determined that justice did not require enforcement of the bid. CGS appeals.

## II. Discussion

We review a district court's grant of summary judgment de novo, examining the record in the light most favorable to CGS, the nonmoving party. *Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*, 600 F.3d 878, 882 (7th Cir. 2010). Summary judgment is appropriate if there is no genuine dispute of material fact and the nonmovant is entitled to judgment as a matter of law. *Id.*

### A. Breach of Contract

CGS first argues that PNA's initial bid was an offer and that CGS accepted that offer by selecting PNA's bid, thus forming an enforceable contract. CGS contends that the subsequent negotiations merely modified the terms of this existing contract. Therefore, CGS claims that PNA breached a binding agreement by disengaging from the project.

Both parties agree that Wisconsin law governs this dispute. Under Wisconsin law, an enforceable contract has three elements: offer, acceptance, and consideration. *Runzheimer Int'l, Ltd. v. Friedlen*, 862 N.W.2d 879, 885 (Wis. 2015). Agreements to agree are not enforceable as contracts in Wisconsin. *Witt v. Realist, Inc.*, 118 N.W.2d 85, 93–94 (Wis. 1962).

Both parties also agree that the Uniform Commercial Code ("UCC") applies because CGS engaged PNA for the sale of a good. Wis. Stat. § 402.102. Under the UCC, offer and acceptance are defined more liberally than under Wisconsin common law. A contract "may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Wis. Stat. § 402.204. A contract may be formed even if some of the terms are left open or the moment of formation cannot be determined with certainty. *Id.* Unless otherwise indicated, an offer is construed as inviting acceptance in any manner reasonable under the circumstances. Wis. Stat. § 402.206. Accordingly, an enforceable contract may be formed by conduct, even without a signed writing embodying the agreement. *Associated Milk Producers, Inc. v. Meadow Gold Dairies, Inc.*, 27 F.3d 268, 271 (7th Cir. 1994) ("Even if the parties' writings do not constitute a contract, however, the parties may nonetheless be found to have established a contract through their actions.").

Even under the more flexible UCC standard, "a court must still make the threshold factual finding that an intent to contract existed." *Ginsu Prods., Inc. v. Dart Indus., Inc.*, 786 F.2d 260, 265 (7th Cir. 1986) (applying Wisconsin law). Intent to be bound is a question of fact. *Id.* at 262. Intent is determined objectively by looking at the parties' words, both written and oral, and their actions. *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987) (applying Wisconsin law). When the parties' public or shared conduct is undisputed, as it essentially is in this case, summary judgment is appropriate. *See id.* at 815.

With these principles in mind, we agree with the district court that no reasonable jury could find that the parties manifested an intent to be bound. Before negotiations began, PNA made clear that it intended to be bound only after reviewing the prime contract and executing a formal subcontract with agreed upon language. PNA manifested a belief that it was not bound throughout negotiations, and CGS never corrected this understanding nor expressed a contrary belief.

The course of negotiations and slow build up to an integrated subcontract confirm that the parties had not yet entered into a binding agreement:

> It is well settled that no contract is formed where two parties consider the details of a proposed agreement, perhaps settling them one by one, with the understanding during this process that the agreement is to be embodied in a formal written document and that neither party is to be bound until he executes the document.

*Gruen Indus., Inc. v. Biller*, 608 F.2d 274, 280 (7th Cir. 1979) (citation and internal quotation marks omitted) (applying Wisconsin law). CGS and PNA continued to refine terms of the agreement throughout negotiations.[3] And the parties understood that they were working towards a formal, binding

---

[3] The parties dispute the extent to which the price changed over the course of negotiations. CGS emphasizes that the price of the core curtainwall component remained relatively constant, changing only once. Meanwhile, the total contract price, which included the price of alternates, fluctuated substantially throughout negotiations. We note that the central price terms remained fairly constant throughout negotiations. Nevertheless, the variance in the parties'

agreement. CGS's internal policies and its contract manual re-
quired written agreements with all subcontractors. Addition-
ally, CGS never "pre-qualified" PNA—or cleared PNA with
its risk management department—despite having a policy of
doing so prior to signing a subcontract.

To put this point another way, CGS never accepted PNA's
bid.[4] Quite the opposite, CGS deliberately refrained from ac-
cepting while it reached the necessary agreements with the
project owner and continued to negotiate the price and terms
of the subcontract with PNA. Even after CGS entered into the
GMPA with the project owner, the parties still never reached
a binding agreement. Instead of accepting PNA's latest bid
upon execution of the GMPA, CGS countered with its own
proposal and waited for PNA's comments. Indeed, the parties
never agreed on the total contract price—CGS's final pro-
posed subcontract, sent to PNA on June 16, 2014, contained a
different total contract price than PNA's final bid, sent on May
29.

Any remaining doubt about the lack of a binding agree-
ment is dispelled by the two letters of intent. The letters of
intent state that "it is the intent of [CGS and PNA] to enter
into a Subcontract agreement …" and "[u]pon execution of
the Subcontract agreement between [CGS and PNA], the Sub-
contract and its Exhibits shall supersede in all respects prior
negotiations between [CGS and PNA], including this letter of

---

respective positions on other aspects of the agreement indicates
that they lacked the requisite intent to be bound.

[4] Since CGS never accepted PNA's bid, we need not decide
whether PNA's bid constituted an offer, an issue that the district
court found to be a close call.

intent." That is, the letters of intent express in no uncertain terms that the parties had not yet solidified their relationship in a binding agreement. Their prior communications up to and including the letters of intent were merely negotiations. In fact, if there had been a binding agreement in place from the time CGS selected PNA's bid, there would have been no need for PNA to request the letters of intent—essentially, financial commitments—in the first place.

In arguing that the parties were in fact bound by the initial bid, CGS emphasizes that PNA took actions that it ordinarily would not have taken without a contract in place, primarily by attending the kick-off meeting. But these minor departures from PNA's general practice fall short of creating a genuine dispute whether the parties intended to be bound, especially considering the protracted nature of negotiations and the pressure to keep construction on schedule.

In sum, the undisputed evidence shows that up until the point of disengagement, CGS and PNA were in the midst of a negotiation. The parties intended to reach a final, binding agreement, but that agreement never materialized.

### B. Promissory Estoppel

The more difficult question is whether PNA is liable under a theory of promissory estoppel. CGS argues that PNA made a promise to CGS to supply the curtainwall and that CGS reasonably relied on that promise by incorporating PNA's May 16 bid price into its own bid to the project owner. CGS points to the deposition testimony of a PNA employee stating that a general contractor could reasonably rely on PNA's bid if the general contractor carried that bid in its quote to the owner.

To prevail on a theory of promissory estoppel under Wisconsin law, a plaintiff must establish: (1) a promise that the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) action or forbearance induced by the promise; and (3) that injustice can be avoided only by enforcing the promise. *Hoffman v. Red Owl Stores, Inc.*, 133 N.W.2d 267, 275 (Wis. 1965). The first two requirements are questions of fact while the third is a question of law. *Id.* This Court has cautioned that promissory estoppel is only available in "limited circumstances" and does not allow "circumvention of carefully designed rules of contract law." *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir. 1999)**.**

The construction bidding context is a classic battleground for the application of promissory estoppel. The seminal case on this topic, *Drennan v. Star Paving Co.*, explains that when a general contractor uses a subcontractor's bid in making its own bid to the project owner, it relies on the subcontractor's bid. 333 P.2d 757, 760 (Cal. 1958). Given that the subcontractor should expect a general contractor to incorporate the subcontractor's bid, "it is only fair that [the general contractor] should have at least an opportunity to accept [the subcontractor's] bid after the general contract has been awarded to him." *Id.*

Wisconsin continues to apply the *Drennan* rule to enforce subcontract bids. In *Seater Construction Co. v. Rawson Plumbing, Inc.*, a subcontractor submitted a bid and the general contractor incorporated it into its own bid to the City of Waukesha. 619 N.W.2d 293, 294 (Wis. 2000). The subcontractor never signed a written subcontract and refused to begin

performance because of an error in its bid. *Id.* at 295. The Wisconsin Supreme Court held that the subcontractor was bound to its bid under promissory estoppel because the subcontractor's bid was a promise that the general contractor reasonably relied on in submitting its own bid to the City. *Id.* at 299. Further, the court observed that enforcing the subcontractor's bid would avoid the injustice of compelling the general contractor to find another subcontractor at a higher price. *Id.* Similarly, in *Janke Construction Co. v. Vulcan Materials Co.*, we applied Wisconsin law in holding that a general contractor could assert promissory estoppel against a subcontractor because it reasonably relied on the subcontractor's bid in making its own bid. 527 F.2d 772, 779 (7th Cir. 1976).

Nonetheless, courts generally distinguish cases in which a general contractor attempts to renegotiate the subcontractor's bid, a practice known as "bid chiseling." *See* CORBIN ON CONTRACTS, § 2.31 (2015) ("[I]t is generally agreed that the general contractor cannot, after being awarded the contract, reopen the bidding with the subcontractors to chisel down the bids, while at the same time maintaining that the low-bidding subcontractor remains liable."). Indeed, *Drennan* noted that "a general contractor is not free to delay acceptance after he has been awarded the general contract in hope of getting a better price. Nor can he reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer." 333 P.2d at 760.

When a general contractor reopens bidding with the subcontractor, promissory estoppel may be denied for a number of reasons, including that the general contractor did not "in fact rely on the subcontractor's bid, or failed to accept it within a reasonable time, or rejected it by a counter-offer, or, perhaps

more persuasively, because in such circumstances there is a failure to meet [the] requirement that injustice can be avoided only by enforcement of the promise." *Preload Tech., Inc. v. A.B. & J. Constr. Co.*, 696 F.2d 1080, 1089 (5th Cir. 1983) (citation and internal quotation marks omitted). For example, in *APAC-Southeast, Inc. v. Coastal Caisson Corp.*, a general contractor asserted promissory estoppel against a subcontractor after the general contractor incorporated the subcontractor's bid into a prime contract. 514 F. Supp. 2d 1373, 1375 (N.D. Ga. 2007). Instead of accepting the subcontractor's bid after signing the prime contract, the general contractor sent the subcontractor its form subcontract with materially different terms from the bid. The court held that promissory estoppel was inappropriate because the general contractor "forfeited its right to hold [the subcontractor's] bid open when it counteroffered with its form subcontract." *Id.* at 1379.

This limit to the application of promissory estoppel exists because of the inequity in allowing the general contractor to shop for lower bids or negotiate with the subcontractor while holding the subcontractor to its bid. *See* Avery Katz, *When Should an Offer Stick? The Economics of Promissory Estoppel in Preliminary Negotiations*, 105 YALE L.J. 1249, 1277–78 (1996). Without such a rule, the general contractor, already in a position of power because it can select among subcontractor bids, would be given even more bargaining power over the subcontractor. By limiting the application of promissory estoppel, the general contractor can either keep the subcontractor's bid open for a reasonable amount of time or seek a better deal, but not both.

Applying this rule, we hold that CGS's promissory estoppel claim fails as a matter of law. CGS did not accept PNA's

bid; instead, CGS delayed acceptance and negotiated with PNA while it also negotiated with the project owner. In fact, CGS continued to negotiate with PNA even after CGS signed the GMPA with the project owner. These facts distinguish this case from the likes of *Seater* and *Janke* and preclude CGS's promissory estoppel claim for at least two reasons.

First, given both parties' expectation of further negotiations, it is questionable whether we can construe PNA's bid as a promise upon which CGS could reasonably rely. Soon after submitting its initial bid, PNA announced that it expected to review the prime contract and negotiate certain aspects of the subcontract prior to executing an agreement. Conditional promises of this kind are not a reasonable basis for reliance. *Gruen Indus.*, 608 F.2d at 281. Once CGS selected PNA's bid, the parties entered a negotiation that spanned over the next year. CGS was perhaps reasonable in expecting that the parties would ultimately form a binding agreement. But it was not reasonable for CGS to rely on any of PNA's specific bids. CGS knew, or at least should have known, that the negotiations could fall apart before the parties entered into a binding agreement.

Second, there is no injustice in permitting PNA to withdraw its bid. Applying promissory estoppel to this case would essentially give CGS an option contract on PNA's bid that it did not bargain for. Correspondingly, it would put PNA at the mercy of CGS's superior bargaining position. In other words, it would "transform these complex negotiations into a 'no lose' situation" for CGS. *Id.* at 282. In complex negotiations between sophisticated parties, it is preferable to leave the

losses where they fall, rather than enforcing preliminary ne-
gotiation positions wrought with contingencies and uncer-
tainty. *Id.*

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the
district court.