In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 24-1627

CHARLES BICH and BRUNO BICH TRUST,

*Plaintiffs-Appellants*,

*v.*

WW3 LLC and CURT D. WALDVOGEL,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:20-cv-01016-WCG — **William C. Griesbach**, *Judge*.

_____

ARGUED NOVEMBER 6, 2024 — DECIDED MARCH 10, 2025

_____

Before BRENNAN, KOLAR, and MALDONADO, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Charles Bich and a trust belonging to his father, Bruno Bich, made a series of loans to a company constructing what was supposed to be a lucrative oil-processing facility. The debtors purportedly assured the lenders their investment would be "secured," or "backed," by real and personal property. When the project did not succeed, the lenders did not receive their money back, so they sued the debtors for breach of contract. Under Wisconsin law, any time

property serves as security for a loan, the parties must satisfy the statute of frauds. Because there was no written evidence meeting that requirement, the loan agreement is unenforceable.

**I**

**A**

In 2014, Curt Waldvogel purchased vacant real property in North Dakota to capitalize on a growing oil and gas market in the state. He eventually transferred the land to WW3 LLC, of which he was the sole owner. Waldvogel and two business partners planned to construct a facility on the land that would process all oil waste originating from the nearby Fort Berthold Reservation. To obtain the necessary equipment, Waldvogel needed money. He approached Charles Bich, a longtime acquaintance, about investing in the project. To entice Charles's investment, Waldvogel told him the facility would be the only one of its kind in the area, giving it a monopoly over processing reservation oil waste.

Charles discussed the investment with his father, Bruno Bich, who agreed to fund the project through his trust.[1] The Bichs say Waldvogel promised them the land and improvements would "back" and "secure" any investment. Waldvogel disputes he made this promise.

Waldvogel and his business partners created two other entities for the project. One was Branch Energy and Environmental Services, LLC ("Branch"), which was designated as a

---

[1] Although one plaintiff is a trust, we refer to them collectively as "the Bichs." When discussing them individually, we refer to them as "Charles" and "the Trust."

holding company for both the property and the operating entity. Waldvogel and the two partners—not the Bichs—were Branch's owners and managers. The other entity was Mandaree Project, LLC, a wholly owned subsidiary of Branch, which would operate the facility.

The Bichs began investing in the project through a series of convertible notes issued by Branch. The notes allowed the Bichs the opportunity to convert their initial debt positions into equity. They never exercised that right. Between September and December 2014, the Bichs each loaned Branch $625,000, for a total investment of $1,250,000.

The facility's operations ran into immediate problems. Contrary to expectations, it was not the sole treatment facility for oil waste originating on reservation lands. And the permitting process took longer than anticipated, leading to reduced customer interest. Waldvogel solicited the Bichs in mid-2015 for additional investment to keep operations afloat. Charles and the Trust each loaned Branch another $175,000. So, the Bichs' total investment up to that point was $1,600,000.

After this second round of loans, in April 2015 Waldvogel emailed Bich a document titled "Land Lease/Purchase Agreement." It clarified that Waldvogel—presumably through WW3—would lease the land to Branch. It further stated Branch would buy the property at an undetermined date, and the proceeds would be distributed to Branch investors to allow them to "recapture [their] investment first." But the email said the document was only "the start" of preparing the lease agreement, as Waldvogel "[knew] there's more needed." He requested Charles "[a]dd as you think needed" to the preliminary plan. There is no evidence in the record of Charles responding to this email.

Toward the end of 2015, Branch's financial condition showed no signs of improving. Growing concerned about his repayment prospects, Charles emailed Waldvogel in January 2016 seeking clarity on his and the Trust's interest in the land and improvements. Charles wrote, "[i]f there is a need to shut down" the operating entities, "we will still be partners on anything done with the land." If the land was to be leased to a different operating company, the rent should be split "based on each person's capital contribution." Once each party recovered its investment, they could agree to "split the rent differently."

Charles continued, "we have discussed many times that we need to put our agreement in writing," asking "what else [Waldvogel] would like" in a potential agreement. Waldvogel responded that the parties had "spoke[n] about this much in the past." He assuaged Charles's concerns, providing that "the people who put the capital in … will be first in line to get repaid, if at all possible." But the parties did not sign a final agreement.

To exit the project's downward spiral, Waldvogel and the Bichs sought to lease or sell the property to a third party. Charles made an additional $45,000 loan to facilitate a possible lease.[2] WW3 contracted with an entity in February 2017 to lease the property, granting the entity an option to purchase it. The parties dispute whether they reached an agreement that the lease payments would be used to repay the Bichs'

---

[2] In total, then, the Bichs loaned over $1.6 million to Waldvogel and WW3—loans which they assert the property "secured" or "backed." We recognize that the Bichs made other loans to Waldvogel not discussed above. But the district court granted them summary judgment on those transactions, a decision not relevant to this appeal.

loans. Regardless, Waldvogel disbursed the lease payments from WW3 to himself—but remitted none to the Bichs. After months of receiving no share of the rental income, Charles emailed Waldvogel to request an update. Waldvogel did not respond to the request and ceased communications with the Bichs entirely in 2019.

The entity eventually purchased the property from WW3 in September 2020 for $1,800,000. Waldvogel did not share any proceeds with the Bichs.

## B

The Bichs sued WW3 and Waldvogel in the Eastern District of Wisconsin. They alleged breach of contract and unjust enrichment, among other claims not relevant here.[3] Waldvogel's primary defense was that, assuming he made the alleged promise, it qualified as a "special promise" to satisfy the loans made to Branch. *See* WIS. STAT. § 241.02(1)(b). He further argued that special promises must satisfy the statute of frauds—the rule that certain contracts must be written. *Id.* As there was no writing that met the necessary requirements, any alleged promise was unenforceable.

The district court agreed with Waldvogel. It concluded his promise that WW3's real property would "back" the Bichs' loans to Branch was a special promise, thus falling within the statute of frauds. Because any liability was "dependent upon [Branch's] obligation to pay," the promise was "collateral,"

---

[3] Because neither "party raise[d] a conflict of law issue," the district court properly applied the law of Wisconsin, the forum state. *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 522 (7th Cir. 2022).

not "primary." *Mann v. Erie Mfg. Co.*, 120 N.W.2d 711, 714 (Wis. 1963).

The court also determined that any alleged promise would have been a mortgage under Wisconsin law. *See* WIS. STAT. § 851.15. The Bichs asserted that the property would serve as collateral, not that Waldvogel was personally liable for the loans, so under Wisconsin law the promise would have been a mortgage. And to be enforceable, mortgages must also satisfy the Wisconsin statute of frauds. *Id.* §§ 706.001(1), 706.02(1).[4] Because the writings here did not meet the statutory requirements, Waldvogel's promise that the property would "back" the loans was unenforceable. That resolved the Bichs' contractual claims.

The Bichs also alleged equitable claims, including one for unjust enrichment. The court found that Waldvogel and WW3 were not entitled to summary judgment on this claim, as the evidence showed a reasonable jury could conclude it would be inequitable for them to retain the benefit they received from the Bichs' loans. But it also denied summary judgment to the Bichs. Because unjust enrichment claims are often "factually intens[ive]" and material facts were in dispute, the court ruled it would have been improper to keep the claim from the factfinder.

The case then went to trial on the sole issue of whether the loans unjustly enriched WW3. The jury concluded they did, but awarded only $200,000, split equally between the Bichs. After trial, the court found Waldvogel jointly and severally

---

[4] Land conveyances and personal guarantees are listed in separate chapters of the Wisconsin Statutes—§ 706.02 and § 241.02, respectively. But they both require compliance with the statute of frauds.

liable with WW3 for the damages. The sum awarded was well shy of the amount the Bichs sought. They timely appealed the court's grant of summary judgment on their breach-of-contract claim, but they do not appeal the jury's verdict on their equitable claims.

## II

The Bichs raise two arguments as to why the district court improperly granted summary judgment to the defendants. First, they contend the court incorrectly concluded that Waldvogel's promise—that the property would secure the loans—was collateral or contingent, rather than unconditional or primary. For, if the promise is contingent, "to answer for the debt … of another," it falls within the statute of frauds. Wis. Stat. § 241.02(1)(b). But if a promise is "unconditional and primary," it can be enforced without a writing. *Mann*, 120 N.W.2d at 713–14. Second, they argue even if the district court were correct in finding the promise contingent, and thus subject to the statute of frauds, the writing requirement was satisfied here through the emails.

Before considering the merits of the Bichs' appeal, we point out a quirk in the procedural history. The jury awarded the Bichs damages for unjust enrichment, partially compensating them for the loans made. Under Wisconsin law, a party cannot "recover damages for both breach of contract and unjust enrichment based on the same conduct." *Mohns Inc. v. BMO Harris Bank Nat'l Ass'n*, 954 N.W.2d 339, 353 (Wis. 2021). Unjust enrichment "presupposes that a contract does not exist," hence the need for "an equitable remedy." *Id.* at 354.

If we conclude that a contract was formed and Waldvogel breached it, the damages for "unjust enrichment must be set

aside." *Id.* The Bichs clarified at oral argument before us that they will forgo the $200,000 award from the unjust enrichment verdict if we hold that an enforceable contract existed here.[5] With that understanding, we review de novo the district court's summary judgment decision, "construing the evidence in the light most favorable to the non-moving parties and drawing all reasonable inferences in their favor." *Navratil v. City of Racine*, 101 F.4th 511, 518 (7th Cir. 2024). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

## A

The Bichs argue the district court erred in concluding that Waldvogel's promise—to "back" any investment with the property—was a "special promise" under Wisconsin law. WIS. STAT. § 241.02(1)(b). Waldvogel responds by pointing to evidence that the property would be sold only if Branch's operations did not allow the Bichs to recoup their initial investment.

The parties focused their briefing, both in the district court and before us, on whether Waldvogel made a special promise to the Bichs, guaranteeing any amount they provided to construct the property. None of the cases the parties cite discussing personal guarantees deal with the factual situation here— specifically, that the promisee receives an assurance that property would secure its investment. Instead, in all those cases, the promisor was personally liable on the conditional promise. *See Mann*, 120 N.W.2d at 713–14; *Marshall v. Bellin*, 133 N.W.2d 751, 751–52 (Wis. 1965). But neither party argues

---

[5] Oral Arg. at 1:28–2:00.

that Waldvogel personally agreed to be liable if the project fell flat. Rather, the Bichs' recourse would be to recover against the real property.

The reason why is straightforward: When property—rather than a person—guarantees a promise, a mortgage results. WIS. STAT. § 851.15 ("'Mortgage' means any agreement or arrangement in which property is used as security."); *Wozniak v. Wozniak*, 359 N.W.2d 147, 150 (Wis. 1984) ("[A] transfer of property as security, regardless of the form thereof, is a mortgage."). And the Bichs allege, both in their complaint and other filings with the district court, that the real property would "secure[]," or serve "as collateral" for, any investment.

Although the parties did not pursue this particular statute of frauds argument in the district court, we can affirm that court's summary judgment grant "on any ground supported by the record so long as plaintiff 'had an opportunity to contest the issue.'" *Gilbank v. Wood Cnty. Dep't of Hum. Servs.*, 111 F.4th 754, 787 (7th Cir. 2024) (en banc). This change should not surprise the litigants. The district court flagged this as an alternative basis to grant the defendants summary judgment, giving them the chance "to contest the issue" on appeal. *Id.* With this understanding, we evaluate whether the Bichs produced written evidence of a land conveyance sufficient to satisfy the statute of frauds.

**B**

Under Wisconsin law, a conveyance requires that the writing (1) identifies the parties; (2) identifies the land; (3) identifies any interest conveyed; and (4) be signed by all parties.

WIS. STAT. § 706.02(1). But before addressing these statutory
elements, we note the emails here do not even express
Waldvogel's assent to any terms of the alleged conveyance.
Both of the writings show he was amenable to negotiating
terms, yet neither demonstrates a final agreement. If the par-
ties "are left with an understanding and intent to reach an
agreement in the future," no enforceable contract exists. *Witt
v. Realist, Inc.*, 118 N.W.2d 85, 94 (Wis. 1962); *C.G. Schmidt, Inc.
v. Permasteelisa N. Am.*, 825 F.3d 801, 805 (7th Cir. 2016).

Start with the document titled "Land Lease/Purchase
Agreement." It states that, upon a land sale, "Curt and Branch
investor(s) will recapture investment first. Monies in excess of
that will be distributed to owners of Branch based on their
percentage ownership at time of sale." If Waldvogel had
signed this, it may have been sufficient to grant the Bichs a
mortgage on the property. But that document was not signed.
Rather, it was attached to an email that read: "This is the start
of what I have. Know there's more needed. Add as you think
needed." Although Waldvogel signed the email, its text
shows the document was a draft and not a true offer. His sig-
nature did not "evidence his intent to become bound by the
agreement." *Nelson v. Albrechtson*, 287 N.W.2d 811, 816 (Wis.
1980).

The same is true for Waldvogel's next email. While he
acknowledged the parties needed an "agreement in writing,"
he continued: "[a]ll factors need [to be] considered when de-
termining how/what we do to come out of this whole, if it
comes to that." Further, this was in a response to an email
from Charles asking Waldvogel to "let him know what else
you would like in [an] agreement" not yet drafted. The email
and attached document show only an "[a]greement[] to

agree," which is "not enforceable" as a contract. *C.G. Schmidt, Inc.*, 825 F.3d at 805 (citing *Witt*, 118 N.W.2d at 93–94). Without "definite and certain" terms and "the parties manifest[ing] an intent to be bound," we cannot conclude a contract was created. *Reetz v. Advoc. Aurora Health, Inc.*, 983 N.W.2d 669, 682 (Wis. Ct. App. 2022) (quotations omitted).

Even if the emails showed the parties agreed to something, they still must satisfy the statute's specific elements.[6] WIS. STAT. § 706.02(1). First, any written "conveyance must identify the property with 'reasonable certainty.'" *Anderson v. Quinn*, 743 N.W.2d 492, 500 (Wis. Ct. App. 2007) (quoting *Wiegand v. Gissal*, 137 N.W.2d 412, 414 (Wis. 1965)). Although "a legal description" of the property is unnecessary in the writing, "a reasonable third party" must "be able to pinpoint the specific property to which the parties were referring." *Prezioso v. Aerts*, 858 N.W.2d 386, 393 (Wis. Ct. App. 2014). If multiple properties could be at issue, a court will hold the writing too indefinite. *Stuesser v. Ebel*, 120 N.W.2d 679, 681–82 (Wis. 1963). But when a description is imperfect, yet permits the court to identify the property "with reasonable certainty," the description will not cause the conveyance to fail. *Zapuchlak v. Hucal*, 262 N.W.2d 514, 520 (Wis. 1978).

---

[6] The Bichs cite one of our circuit's cases for the proposition that "the strictures of the statute of frauds can safely be relaxed" when "there is particularly compelling evidence of the contract's existence." *Consolidation Servs., Inc. v. KeyBank Nat'l Ass'n*, 185 F.3d 817, 821 (7th Cir. 1999). But that case dealt with Indiana law, not Wisconsin law. *See id.* at 819. Even if there was an oral contract here, it is still "void unless there is a memorandum that conforms to the Statute of Frauds." *Trimble v. Wis. Builders, Inc.*, 241 N.W.2d 409, 413 (Wis. 1976).

Here, the emails are not indefinite. Though the description of a "20 acre property" is not perfect, there is only one property that could possibly meet that description. The parties produced the warranty deed from Waldvogel's purchase, as well as the final sales document, which both describe the same 20-acre property. And there is no evidence that Waldvogel or WW3 owned any other property. Accordingly, a "reasonable third party" would be able to "pinpoint the specific property" at issue, so this element is met. *Prezioso*, 858 N.W.2d at 393.

Second, because the writings were emails Waldvogel and Charles exchanged, the signature requirement is satisfied. We could locate no Wisconsin published decision that has addressed this issue. But there is a consensus of persuasive authority holding that an email signature is sufficient to meet the requirement of the statute of frauds. *See Williams v. Enbridge Pipelines (Lakehead), LLC*, No. 2009AP1006, 2011 WL 4596153, at *6 (Wis. Ct. App. Oct. 6, 2011) (interpreting Wisconsin statute of frauds); *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 295–96 (7th Cir. 2002) (interpreting Uniform Commercial Code's statute of frauds).

Third, it is unclear whether any of the writings "[i]dentif[y] the parties." WIS. STAT. § 706.02(1)(a). The two emails from Waldvogel—the proposed lease agreement and reply email to Bich—do not identify Charles or the Trust by name. Instead, they refer to "Branch investor(s)" and "the people who put the capital in," both classes of which the Bichs are undisputedly members. Though it may be likely that referring to a closed class of individuals is enough to adequately identify them under Wisconsin law, we ultimately need not reach that issue.

The fundamental failure here under the statute of frauds is that no writing identifies the interest conveyed to the Bichs. The documents all say they expect to be repaid for loans made to Branch. But nothing signed by Waldvogel states that the Bichs received an interest in the land in question; they simply held an unsecured loan. "Nowhere does this agreement convey, give, or promise" them "anything," much less a security interest in the property. *Trimble*, 241 N.W.2d at 415.

Wisconsin courts provide five traditional hallmarks of a mortgage: "(1) the conveyee's interest was expressed as a lien; (2) the lien attached to specific property; (3) the lien was a guarantee that a certain sum of money would be paid; (4) interest was earned on the debt; and (5) the debt had a due date." *Equitable Bank, S.S.B. v. Chabron*, 618 N.W.2d 262, 265 (Wis. Ct. App. 2000); *Wozniak*, 359 N.W.2d at 150.

Critically here, no documents demonstrate that Waldvogel conveyed a lien on the real property. Nor are there any writings showing the amount owed, interest rate charged, or the debt's due date. Some of this information is presumably contained in the convertible notes signed by both parties and prepared by the Bichs' law firm. But those notes were not in the record at summary judgment. Because "[s]ummary judgment is the 'put up or shut up' time in litigation," and the Bichs did not offer information about the loans' terms, they failed to carry their burden. *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024).

As the Bichs argue, it is true that if the writing merely confirms an existing oral contract, that memorandum need not set forth all possible terms of the agreement. *See Trimble*, 241 N.W.2d at 413. But regardless of whether a writing is a contract or only a confirming memorandum, it still "must contain

all the elements essential to satisfy the Statute." *Id.* Because the writings here did not do so, the district court correctly concluded that the Bichs' breach of contract claim fails.

The Bichs resist this conclusion by arguing they were "partners" in the property. This falls short for three reasons. First, under Wisconsin law, an individual is not a partner in a partnership unless he is a "co-owner[]" of the business. WIS. STAT. § 178.0202(1). The Bichs invested in the property "only through a series of convertible notes." Like most convertible notes, these gave them the opportunity to convert their debt positions into equity. Yet nothing shows the Bichs ever exercised the right to convert. Rather, Waldvogel stated in a deposition that the Bichs did not exercise that right. Charles confirmed this at trial, saying he never converted into an equity position because the project "turned into such a mess." Because the Bichs did not obtain equity in the alleged "partnership," they remained debt holders.

Second, the Bichs make no legal argument—either in their summary judgment brief or on appeal—about how the elements for a partnership are satisfied here. *See Heck & Paetow Claim Serv., Inc. v. Heck*, 286 N.W.2d 831, 835–36 (Wis. 1980). Instead, they vaguely assert they were "partners" in the disputed property. Considering the "burden of proving the existence of a partnership" is on the party "asserting its existence," this is not enough. *Id.* at 836.

Third, the Wisconsin Supreme Court has held that "a joint adventure or a partnership to engage in the sale or purchase of real estate is held to be a contract respecting an interest in lands, and void under the statute of frauds, unless in writing, or unless sufficiently performed to take the same out of the statute." *In re Est. of Schaefer*, 241 N.W.2d 607, 610 (Wis. 1976)

(quoting *Goodsitt v. Richter*, 257 N.W. 23, 24 (Wis. 1934)).[7] So, even if the parties orally agreed to form a partnership, that agreement is unenforceable for the same reasons as the purported mortgage.

*           *           *

Written agreements protect all stakeholders when business ventures turn sour. Because the parties here did not have one satisfying the Wisconsin statute of frauds, we AFFIRM the district court's decision.

---

[7] Courts may grant equitable relief if not all writing requirements are met to satisfy the statute. *See* WIS. STAT. § 706.04. One reason for equitable relief may be partial performance by the parties. *See Clay v. Bradley*, 246 N.W.2d 142, 145 (Wis. 1976). But the Bichs' equitable claim for unjust enrichment proceeded to trial, and they do not appeal that judgment. So no equitable claim remains to be pursued here.