COURT OF APPEALS
DECISION
DATED AND FILED

March 3, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.        **2020AP1522-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2015CF205

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

DARRELL MARTEZ SMITH,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Rock County: JAMES P. DALEY and KARL R. HANSON, Judges. *Affirmed*.

Before Blanchard, P.J., Fitzpatrick, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  Darrell Smith, pro se, challenges the circuit court order denying his pro se motion for postconviction relief without holding an evidentiary hearing.  We conclude that the circuit court was not required to hold an evidentiary hearing because Smith failed to allege material facts that, if true, would have been sufficient to entitle him to relief.

## BACKGROUND

¶2     Smith was charged with armed robbery as a party to the crime, attempting to flee or elude a traffic officer as party to the crime, and obstructing an officer.  The criminal complaint contained allegations that included the following.  Shortly before 12:52 a.m. on January 28, 2015, Smith, together with Milon Stewart and Robert Johnson, robbed a person, whom we will call J., at gunpoint outside an apartment building in Janesville.[1]  The three men fled in a grey Chevrolet Impala.  J. trailed the Impala while he was on the phone with the 911 center, relaying the Impala's location.  Acting on this information, police spotted the Impala, and at about that time J. ended his pursuit.  There was a high speed police chase, which ended with the Impala crashing into a line of bushes or trees.  Smith, Stewart, and Johnson all tried to avoid arrest by fleeing police on foot, but each of them was arrested.

¶3     One person mentioned in the complaint is Bradley Haines, one of J.'s neighbors.  According to the complaint, J. told the police investigating the alleged armed robbery that he visited with Haines just before the robbery.  As

---

[1] Pursuant to WIS. STAT. RULE 809.86(4) (2019-20), we use a pseudonym instead of the victim's name.  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

summarized more completely in the Discussion section below, Haines gave statements to police investigating this case but he was not called as a witness by either side at trial.

¶4    Stewart entered into a plea agreement with the State and was sentenced in July 2015.[2]  Stewart testified at Smith's jury trial in December 2015 as a witness called by the prosecution, making statements that incriminated Smith. After the joint trial of the charges against Smith and Johnson was underway, Johnson decided to enter into a plea agreement with the State.  Johnson elected not to testify as the trial continued, with Smith as the sole defendant.

¶5    The jury found Smith guilty on all three charges and the circuit court sentenced him in April 2016.

¶6    Through new postconviction counsel, Smith filed a postconviction motion for a new trial in November 2017.  This motion was based on a claim of newly discovered evidence.  The evidence was an affidavit by Johnson, which counsel represented that Smith had obtained for the first time only after sentencing.

¶7    In the affidavit, Johnson averred that:  the three persons who encountered J. were Johnson, Stewart, and a person named "Camron" or "Cam" (and not Smith); "Cam" did not depart the scene of the encounter with J. in the car with Johnson and Stewart, but instead "Cam" was left behind; and Johnson, after

---

[2] The Hon. James P. Daley presided over all matters in the case involving jointly filed charges against Smith, Stewart, and Johnson.  This included the trial and denial of Smith's initial postconviction motion.  After this, the Hon. Karl R. Hanson presided over all proceedings before appeal.

leaving the scene, drove to another location where he picked up Smith, just before police began following the car Johnson was driving. On this last point, Johnson averred specifically that, after the encounter with J., but before police started following the car Johnson was driving, Johnson "drove to my Auntie Pam's house to get my cousin Darrell Smith to go back to see if [J.] wanted to fight." We will use the shorthand "the Johnson affidavit" to refer to this account; Johnson provided only one affidavit.

¶8    The circuit court denied this motion without holding an evidentiary hearing. The court made two determinations. First, the court concluded that the Johnson affidavit could not "[b]y any stretch of the imagination" be considered newly discovered evidence, because if the Johnson affidavit were accurate, then at the time of trial Smith himself would have been aware of what Johnson would later aver, and therefore Smith's failure to discover the evidence earlier arose from a lack of diligence in seeking to discover it.[3] The court separately determined that

---

[3] WISCONSIN STAT. § 805.15 provides in pertinent part, with emphasis now added to the element relied on by the circuit court:

> [N]ewly-discovered evidence ….
>
>     ….
>
>     (3) Except as provided in ss. 974.07(10)(b) and 980.101(2)(b), a new trial shall be ordered on the grounds of newly-discovered evidence if the court finds that:
>
>       (a) The evidence has come to the moving party's notice after trial; and
>
>       (b) *The moving party's failure to discover the evidence earlier did not arise from lack of diligence in seeking to discover it*; and
>
>       (c) The evidence is material and not cumulative; and
>
>       (d) The new evidence would probably change the result.

the Johnson affidavit was "unbelievable" because there were multiple sources of evidence at trial firmly establishing that: the Impala fled the scene of the encounter with J.; was trailed by J., who was continually on the phone with the 911 center; and shortly thereafter police started following the Impala. Based on this evidence, the court concluded that there could not have been "time for [the vehicle Johnson was driving] to have gone anywhere else, have a discussion … to convince Mr. Smith to get in the car" so that a newly constituted group of three could "go back and have a fight" with J.

¶9      Appellate counsel for Smith filed a no-merit report in March 2018. *See* WIS. STAT. § 809.32 (setting forth the no merit procedure). In July 2019, Smith asked this court to dismiss the no-merit appeal filed by his counsel so that he could pursue a pro se postconviction motion alleging ineffective assistance of trial counsel. We granted this request and extended the time for Smith to file a postconviction motion.

¶10     In June 2020, Smith filed the pro se postconviction motion at issue in this appeal, attaching materials that included the Johnson affidavit. Smith did not try to directly revive the claim of newly discovered evidence on which his originally filed motion had rested, although as we now discuss one set of arguments in his newly filed motion depended in part on the Johnson affidavit.

¶11     As pertinent to issues that Smith raises in this appeal he made two sets of arguments. The first set was that it was ineffective assistance for trial counsel not to call both Johnson and Brad Haines as defense witnesses, as summarized more fully in the Discussion section below. The second set all focused on Stewart and his testimony, also as summarized below.

5

¶12    The circuit court denied Smith's motion without holding an evidentiary hearing, based on procedural bars.[4]

## DISCUSSION

¶13    We address each of Smith's arguments in turn, providing additional background as necessary.

¶14    At the outset we note that, at many points in his appellate briefing, Smith now references alleged facts and legal standards that he fails to tie to allegations and legal standards that were stated in his postconviction motion. However, we are obligated to maintain our focus on whether the circuit court should have held an evidentiary hearing based on what was actually stated in the motion. The court was required to hold a hearing only if Smith alleged in his motion "sufficient material facts that, if true, would entitle the defendant to relief." *See State v. Allen*, 2004 WI 106, ¶14, 274 Wis. 2d 568, 682 N.W.2d 433. We review de novo whether the facts are allegations are sufficient. *Id.*, ¶9. To the extent that Smith now ignores that legal standard, we reject his arguments as unsupported, and we do not attempt to list all of the occasions on which this occurs.

---

[4] The State on appeal briefly argues in favor of the application of procedural bars to defeat some or all of Smith's arguments. We decline to address those arguments and affirm on alternative grounds. *See Seater Constr. Co. v. Rawson Plumbing, Inc.*, 2000 WI App 232, ¶18, 239 Wis. 2d 152, 619 N.W.2d 293 (appellate courts may affirm correct rulings of circuit courts on grounds different from those expressed by the circuit courts).

## I.    JOHNSON AND HAINES AS WITNESSES

¶15    In his pro se postconviction motion Smith argued in part that it was ineffective assistance for trial counsel not to call both Johnson and Haines as witnesses, because their testimony would have supported a defense theory that Johnson and Stewart drove to pick up Smith only after the encounter with J.  We reject this set of arguments because Smith failed to state sufficient material facts in his motion that, if true, would entitle him to relief based on a theory that trial counsel was ineffective assistance for failing to call Johnson and Haines as witnesses.  In particular, assuming the truth of all allegations in the motion, it failed to describe a scenario in which counsel performed deficiently.

¶16    Our supreme court has summarized the legal standards in pertinent part as follows:

> Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact.  The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law, which we review de novo.  To demonstrate that counsel's assistance was ineffective, the defendant must establish that counsel's performance was deficient and that the deficient performance was prejudicial.  If the defendant fails to satisfy either prong, we need not consider the other.
>
> Whether trial counsel performed deficiently is a question of law we review de novo.  To establish that counsel's performance was deficient, the defendant must show that it fell below "an objective standard of reasonableness."  In general, there is a strong presumption that trial counsel's conduct "falls within the wide range of reasonable professional assistance."  Additionally, "[c]ounsel's decisions in choosing a trial strategy are to be given great deference."

*State v. Breitzman*, 2017 WI 100, ¶¶37-38, 378 Wis. 2d 431, 904 N.W.2d 93 (citations omitted).

¶17     We first address the topic of Johnson as a potential defense witness, then address Haines as a potential defense witness, before turning to any beneficial effect for the defense of the two of them both testifying.

¶18     To repeat, by Smith's own account, Johnson did not provide his affidavit until after the trial was over and Smith had been sentenced.  Even assuming the truth of all statements in the postconviction motion, we conclude that the motion provided the circuit court with an insufficient basis to conclude that Smith's counsel had or should have had a good reason to think, before or during trial, that Johnson would have testified to the account in his affidavit.

¶19     Elaborating on that point, the motion provides insufficient reason to think that Smith's counsel should have suspected that Johnson would give this testimony.  This is in part because the account in the Johnson affidavit runs completely contrary to all of the other evidence on the following key issue.  That issue is whether J. followed the Impala from the scene of the encounter, while on the phone with the 911 center, up to the time at which police spotted and began following the Impala, leaving no possible time or opportunity for Johnson to have driven to a separate location, talked to Smith about joining him and Stewart "to see if [J.] wanted to fight," and then driven away from that location with Smith. The State on appeal points out that five separate witnesses, including two police officers and a completely disinterested witness, all testified at trial to all or parts of a chronology establishing that, after the encounter with the three suspects, J. got into his truck and followed their car until police spotted the car some minutes later.  In his reply brief on appeal, Smith does not dispute that this was the

testimony at trial. More to the point, Smith also does not provide a basis to conclude that trial counsel should have anticipated at the time of trial that Johnson could provide testimony that purported to contradict this evidence.

¶20    Smith suggested in the motion that, for two reasons, it was deficient performance for trial counsel not to have interviewed Johnson as soon as Johnson entered his change of plea during the course of trial, with the assumption being that such an interview would have revealed that Johnson would testify consistently with his later submitted affidavit. First, Smith stated that "Johnson did not give police his account of events[] and in … his jail calls … he doesn't mention Smith's name, but says Milon Stewart went to Brad Haines to sell the victim marijuana and then got into an altercation over the drug." Second, Smith's motion made a partial reference to comments that Johnson made when he entered a plea during the course of trial, which we now quote in full. The context was Johnson's attempt to explain why he would not testify at trial as a witness called by the State.

> Yeah, what I'm saying is, I want to tell the truth, but the deal I took, I think, is—if I take the deal, the deal I took for three years and five, …. If I come out here and tell the truth it's going to look like … I'm not owning up to my—you know what I'm saying? What happens is, you know, you'll probably give me 10 years, 5 out or something.

¶21    We do not discern in these two sets of references by Smith in the postconviction motion a basis to establish that trial counsel's performance fell below an objective standard of reasonableness when he did not interview Johnson as a potential defense witness as soon as Johnson entered his change of plea. Whether considered in isolation or as a totality, they do not support a deficiency determination.

9

¶22 Johnson's failure to give an account to police and his failure to mention Smith in jail calls do not provide a basis to conclude that trial counsel should have understood that Johnson would have testified at trial to the statements reflected in the later produced affidavit, in light of the evidence noted above.

¶23 As for the statement that Johnson made at the time of his plea, it is highly ambiguous. Johnson did not relate what "the truth" might be. He also did not explain why he feared that his testifying to "the truth" might cause the circuit court to sentence him more harshly. If anything, the phrase "I'm not owning up to my…" might on its face appear to suggest that something about "the truth" would somehow taint Johnson for his "not owning up to" *Johnson's* conduct, not to Smith's conduct.

¶24 To clarify, we do not base our conclusion regarding the inadequate allegations regarding Johnson as a potential witness on a determination that the contents of the Johnson affidavit are, as the circuit court stated, "unbelievable." Instead, we conclude that, so far as Smith alleged in his postconviction motion, when the contents of the Johnson affidavit are considered in the context of the information available to trial counsel before or during the course of the trial, the Johnson affidavit would have been understood by Smith's trial counsel as a surprising development that emerged only after trial. That is, Smith's postconviction motion fails to allege facts establishing that trial counsel was unreasonable for failing to anticipate that interviewing Johnson would have led to a viable trial defense along the lines contained in the Johnson affidavit.

¶25 We turn to Haines. To repeat, he was identified in the criminal complaint as a neighbor of J. whom J. told the police J. had been visiting just before the alleged robbery. As with Johnson, we conclude that, even assuming in

Smith's favor the truth of all statements in the postconviction motion, the motion similarly provided the circuit court with an insufficient basis to conclude that Smith's counsel had or should have had a good reason to think that Haines would have been a significantly helpful witness for the defense.

¶26     In his postconviction motion, Smith made references to potential testimony by Haines, based on statements attributed to Haines by police, which were summarized as follows in Smith's motion:

> Brad Haines tells police that he didn't call victim [J.] or anyone else, including Smith, over to his apt.; no one came out to his apt.  [V]ictim [J.] was in his apt. for about an hour before going outside and being attacked; and after hearing a commotion, he walked downstairs and victim [J.] said "someone just f*cked with me."…  Haines did not tell police that he saw any of the 3 suspects or their car leaving the scene or that victim [J.] immediately jumped in his truck to follow the suspects….  Last Haine[s] told police that an unknown white male had the wrong apt.…
>
> … [Haines would have testified] that victim [J.] was still downstairs and didn't immediately follow the suspects, thereby, impeaching [J.] and Eric Sornson['s][5] claims that [J.] immediately did so.…  Indeed, … Haines didn't even see Sornson downstairs .…

¶27     Some of these references in the motion are unclear.  But, we assume without deciding that Haines as a trial witness would have generally raised issues about J.'s exact whereabouts just before the encounter with three alleged assailants and the precise timing of the alleged armed robbery and J.'s pursuit of the alleged assailants.  Even with these assumptions, the postconviction motion failed to

---

[5] Eric Sornson was called as a trial witness by the State, and is the allegedly disinterested witness that we note above.  He testified in part as follows.  Sornson lived in the apartment complex where the alleged armed robbery took place.  He heard loud noises and came outside to see three men fleeing.  J. ran up, said that he had been pistol whipped, told Sornson that he needed to get back his phone and other property, and took off in a truck.

11

provide sufficient material facts that would entitle Smith to relief based on deficient performance of trial counsel. That is, the allegations regarding Haines summarized in the motion, to the extent that they are clear, could reasonably have been assessed by trial counsel as at best collateral to the genuine issues in the case. They do not meaningfully undermine the account by J., Sornson, and other witnesses about how J. ended up following his three alleged assailants and how there was not time for a detour to drive to Smith's location, convince him to get in the Impala to potentially join in a fight, and head toward the apartment building.

¶28 We now address hardcopies from an internet map service showing typical driving times between identified Janesville locations that Smith attached to the postconviction motion and explain why it adds little to Smith's argument that the circuit court should have held an evidentiary hearing. Smith offered these in the postconviction motion in support of the proposition that trial counsel knew or should have known that Smith sometimes resided at a location that was a short drive from the scene of the alleged armed robbery, and that trial counsel should have used those facts to bolster the inference that there was sufficient time for Johnson and Stewart to have driven to find Smith and convinced him to join them after the alleged armed robbery.

¶29 We assume without deciding that the substance of the maps could in themselves lend a degree of support to the new defense theory consistent with the Johnson affidavit. But they do not make up for the insufficiency of the postconviction motion in describing deficient performance by trial counsel in failing to call Johnson and Haines as witnesses based on the information then reasonably available to counsel. For example, the postconviction motion does not allege that trial counsel misunderstood the distances between various locations in Janesville or that counsel failed to investigate a claim made by any source before

or at the time of trial that Johnson and Stewart picked up Smith after the alleged robbery. In sum, the maps' slight potential to bolster the feasibility of the new defense does not alter our conclusion that Smith fails to show that trial counsel had a reason to know that this defense was available.

¶30 The postconviction motion suggested that trial counsel knew or should have known that the *combined* effects of testimony from both Johnson and Haines (along with the internet maps) would have provided the jury with a basis to find that it was "Cam" and not Smith who was the third alleged assailant. However, we have explained why this depends heavily on an unsupported premise, namely, that trial counsel knew or should have known that Johnson would testify consistently with the Johnson affidavit. As a result, the postconviction motion left the circuit court with essentially no potential for Johnson as a useful witness for the defense and Haines's merely limited potential, based on the information available to trial counsel at pertinent times.

## II. STEWART AS WITNESS

¶31 Smith made three arguments in his postconviction motion related to Stewart: (1) that the circuit court violated Smith's right to confront witnesses by limiting his cross examination of Stewart at trial; (2) that the State at trial violated Smith's constitutional due process right to all exculpatory evidence under ***Brady v. Maryland***, 373 U.S. 83, 86 (1963), by failing to disclose that Stewart had a pending robbery charge (in a separate case) that had recently been dismissed; and (3) that the State elicited false testimony from Stewart when he testified that he received no consideration from the State in exchange for agreeing to testify as a witness called by the State in this case. We address these issues in turn, providing additional background as necessary, after first providing additional background.

### A. Additional Background

¶32     On direct, cross, and redirect examination at trial, Stewart testified that, immediately following his arrest on the night of the alleged armed robbery and again three days later while he was in custody, he admitted to police that he had participated in an armed robbery of J. and told police who else was involved, including Smith.

¶33     Under cross examination by Smith's counsel, Stewart testified that he gave police this incriminating information because he wanted to help himself in his own case, meaning that he hoped for consideration regarding his own criminal liability for the alleged armed robbery.  Stewart testified that he faced a robbery charge and knew that he was in trouble, which included a risk that he would go to prison.  After Stewart testified on cross examination about giving police this information in hopes of obtaining help for himself in connection with his case, the following exchange occurred:

> [Defense counsel:]     And you actually were charged with robbery in [this] case, correct?
>
> [Stewart:]     Correct.
>
> [Defense counsel:]     Okay.  And you, yourself, were looking at about ten years in prison on that charge; correct?

The prosecutor did not object to the first question about charging but did object to the second about a possible 10-year sentence, and the circuit court sustained that objection.

¶34     Shortly thereafter, both sides and the court engaged in an extended discussion outside the presence of the jury that we now summarize.

¶35 The circuit court said that Smith's counsel could ask Stewart whether he would "benefit from his plea." The court further said that counsel could ask whether Stewart had been charged "with the same three offenses" that Smith was charged with and could ask him to specify the charges to which he had entered pleas. However, the court said that defense counsel could not ask Stewart to testify regarding how many "years in prison" he could have received, absent the plea, "because that's another way of arguing for your client."[6] The court told Smith's counsel that its reasoning was that it did not "matter how much your client is facing or how much" Stewart was facing. "All you're permitted to ask is whether [Stewart] got some benefit from this plea and if there was an agreement with the State in exchange for the plea."

¶36 The prosecutor told the circuit court that the State had given Stewart an offer in exchange for Stewart's plea, although without specifying to the court what the offer was. The prosecutor noted that Stewart was, obviously, testifying at the trial. But the prosecutor represented that the State had never given Stewart a specific "promise" of "anything" in exchange for Stewart's agreement to testify at trial.

¶37 Defense counsel took the position that, even if there was no specific agreement between the State and Stewart that required Stewart to provide trial testimony, "the fact that" Stewart entered into a plea agreement "could suggest to the jury that he was helping himself by pleading guilty."

---

[6] We interpret this comment to mean that the circuit court wanted to avoid the jury learning the specific sentencing range that Smith faced if convicted and sentenced, because the jury could easily infer what exposure Smith faced if it learned what exposure Stewart faced on the same charges.

¶38 The circuit court said that counsel could "argue the facts," but that counsel could not "get into the plea negotiation between" the State and Stewart, "just as [the prosecutor] can't get into plea negotiations" that might have occurred between the State and Smith.

¶39 Defense counsel asked whether the court would allow him to ask Stewart "what the State agreed" to in the way of a sentencing recommendation for Stewart. The circuit court asked the prosecutor whether there had been "an agreement" between Stewart and the State as to "how much time" the State would recommend. The prosecutor responded:

> There was not. The offer was made. There was no agreement that if you testify I'll recommend this. That was not done.[7]

Defense counsel asked the court if it was ruling that counsel could not ask Stewart "what his plea agreement with the State was, period?" The court responded that defense counsel could ask Stewart "specifically whether or not he had an agreement with the State in exchange for his testimony, a sentencing agreement in exchange for his testimony."

¶40 Defense counsel made the following proffer. Counsel had planned to ask Stewart about any sentencing recommendation that the State agreed to as part of the plea agreement—even if the agreement did not obligate Stewart to testify at trial.

---

[7] Although this response to the court's question is ambiguous, from context we interpret the prosecutor to have intended to convey that the State agreed as part of its plea deal with Stewart in this case to make a sentencing recommendation based on Stewart pleading guilty to charges, but that Stewart did not agree in exchange to testify at the Smith-Johnson trial as a witness called by the State. This also appears to be the way the statement was interpreted by the circuit court and defense counsel.

¶41    The circuit court acknowledged that it was precluding counsel from being able to pose this question.  The court expressed the view that defense counsel was trying to set up a jury argument that Stewart had "changed his testimony" to benefit himself.  The court said that defense counsel was "always going to have that argument [in] the end, but you can't … suggest to the jury that there was a plea agreement in exchange for a sentencing recommendation where there wasn't."  We interpret this last statement to mean that the court sought to preclude defense counsel from suggesting to the jury, contrary to the facts, that there was a plea agreement that obligated Stewart to testify in exchange for a State sentencing recommendation.

¶42    In continuing cross examination before the jury, Stewart testified that he was, in the words of counsel's question, "facing certain criminal charges." However, when defense counsel asked the further question, "You were looking at a robbery charge?" the prosecutor objected and the circuit court sustained the objection.[8]

¶43    Defense counsel asked Stewart if he had "received any consideration from the State in connection with your testimony today?"  Stewart responded "no."  Smith was then permitted by the circuit court to testify that he was then serving a prison sentence.

---

[8] We note that the circuit court's decision to sustain this particular objection is difficult to square with two facts summarized above:  (1) Stewart had previously testified, without objection, that he had been charged with robbery; and (2) the court had said that defense counsel could ask Stewart what charges he faced and what charges he had entered pleas to.  However, Smith does not argue that this apparent inconsistency provides a basis to reverse the challenged circuit court decision.

¶44    However, the court sustained prosecution objections to the following two questions by defense counsel: (1) "You'd like to get out of prison as quickly as you can, correct?" and (2) "[Y]ou're hoping your testimony here will help you sometime in the future, correct?"

¶45    On redirect examination, Stewart testified about having a strong motivation to be released from prison and to be back living with his child:

> I mean doing programs, whatever it takes to get up out of my situation quicker to get back home. It doesn't necessarily mean that I'll come here and testify or slam someone else[']s name just to get out of a plea and sentencing. It just means that whatever it took. If it means not getting in trouble while incarcerated by getting in fights with anybody or not go to the hole, adding segregation time to my sentence. It means what it meant, to do what it takes to be able to come home.

He also repeated testimony that, as stated in the question of the prosecutor, Stewart had not "receive[d] anything, any consideration from the State for testifying today."

## B. Limitations On Cross Examination

¶46    Smith argues that he was entitled to an evidentiary hearing on his claims that the circuit court violated his constitutional right to confront witnesses by limiting his counsel's ability to cross examine Stewart at trial on three topics: whether Stewart hoped that his trial testimony would "help" him "sometime in the future"; what sentencing recommendation the State agreed to make as part of Stewart's plea deal, even if the deal did not involve a promise by Stewart that he would testify at the Smith-Johnson trial; what potential penalties Stewart faced before entering a plea  We conclude that the circuit court properly denied his

request for an evidentiary hearing, because he failed to state facts describing violations of his confrontation right.[9]

¶47     "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. "In all criminal prosecutions the accused shall enjoy the right ... to meet the witnesses face to face." WIS. CONST. art. I, § 7. The federal Confrontation Clause and its Wisconsin analog are "'generally' coterminous," and we have no reason to make further reference to the Wisconsin provision. *See State v. Rhodes*, 2011 WI 73, ¶28, 336 Wis. 2d 64, 799 N.W.2d 850.

¶48     "The right to cross-examination, and thereby confrontation, is not, however, absolute," and "may be limited where necessary to further an important public policy, so long as there are means to assure the reliability of the witness's testimony." *Id.*, ¶¶32, 34. "[T]he confrontation clause does not guarantee cross-examination 'that is effective in whatever way, and to whatever extent, the defense might wish.'" *Id.*, ¶37 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). It "guarantees only the *opportunity* to cross-examine witnesses." *Id.* (emphasis in original). "'[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on … cross-examination [regarding the potential bias of a prosecution witness] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.*, ¶39 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

---

[9] We assume without deciding that Smith did not forfeit his confrontation clause argument, contrary to one argument advanced by the State. We also need not reach the harmless error argument the State offers on this topic.

¶49 Boiling down the additional background above, the circuit court prevented Smith's counsel from asking Stewart what potential prison time Stewart faced before entering his plea and what penalty or range of penalties the State agreed to recommend as part of the plea deal. The court supported this decision on two grounds. First, as noted *supra* in note 6, the court wanted to avoid the jury learning the specific sentencing range that Smith faced if convicted and sentenced, which the court suggested the jury could easily infer if it heard what exposure Stewart faced on the same charges. Second, the court wanted to avoid the jury being led to believe that there was a plea agreement under which Stewart promised to testify in exchange for a State sentencing recommendation. Smith's counsel did not challenge the representation by the prosecutor or the consistent testimony by Stewart that there was no such agreement.

¶50 At the same time, the jury was allowed to learn the following: in statements to police Stewart admitted to his involvement and implicated others from the time of his arrest going forward; Stewart knew from the time of his arrest that he was in trouble; Stewart gave incriminating information to police because he wanted to help himself in his own case; Stewart was charged with robbery and knew that he faced potential prison time as a result; at the time of Stewart's testimony, he was in prison; Stewart was willing to do "whatever it takes" to get out of prison, although that did not "necessarily mean" that he would "slam someone else[']s name." Defense counsel also had an opportunity to challenge Stewart in cross examination on his testimony that, as stated in the question of the prosecutor, Stewart had not received "any consideration from the State for testifying today," although defense counsel did not challenge Stewart on this topic or ask to voir dire Stewart on this topic outside the presence of the jury.

¶51 We now address each of Smith's three postconviction claims on this topic. First, Smith fails to develop a clear, supported argument that it violated his confrontation right for the circuit court to prevent Stewart from answering the question whether he was "hoping" that his trial testimony would "help" him "sometime in the future." It is unclear what the question meant, and Smith's counsel made no attempt to rephrase or focus the question, nor was there a defense proffer on this topic. Smith fails to explain why this was not simply too vague a question to have created any potential confrontation clause issue.

¶52 The second topic is more clear. Smith argues that it violated his confrontation right for the circuit court to prevent questioning regarding the sentencing recommendation that the State agreed to make as part of Stewart's plea deal, even if the deal did not involve a promise by Stewart that he would testify at the Smith-Johnson trial. On this record, and given the "wide latitude" standard articulated by the U.S. Supreme Court and echoed by our supreme court, we conclude that Smith's confrontation right was not violated for the following reasons.

¶53 As we have summarized above, the circuit court permitted the jury to hear substantial testimony from Stewart establishing clear motives for him to try to help himself with police and prosecutors by lying or exaggerating about Smith's conduct at various stages of the case—when Stewart was interviewed by police after his arrest, at the time of his own plea, and in his trial testimony. Given that context, each of the two reasons that the circuit court gave for its ruling on this topic was rationally rooted in the court's expressed concerns that the jury could be confused or unfairly prejudiced by testimony regarding the sentencing recommendation.

¶54     The third topic is closely related to the second. Smith argues that it violated his confrontation rights for the circuit court to prevent questions regarding what potential penalties Stewart faced before entering a plea. Our conclusion on this point is the same as on the last, based on the same considerations.

### C. *Brady*

¶55     Smith's ***Brady*** claim in the postconviction motion was that the prosecution should have, but did not, disclose to the defense that Stewart "was charged on Jan. 30, 2015, with robbery at Exxon Mobile," which was a case that was "pending" with the armed robbery case against Stewart, Smith, and Johnson, and that the Exxon case "was apparently dismissed in light of online records not showing a conviction." As support, Smith attached a partial print out the Consolidated Court Automation Programs (CCAP) entry for the criminal prosecution of Stewart in what was Rock County case 2014CF541, identifying Exxon as a victim. Thus, the motion rested entirely on the ideas that a "pending" case was "apparently dismissed" without a conviction and did not explain in any detail what the State had and had not disclosed in the way of criminal history for Stewart or why this constituted a ***Brady*** violation.

¶56     Criminal defendants have a due process right to favorable evidence "material either to guilt or to punishment" in the possession of the state. ***Brady***, 373 U.S. at 87.

¶57     The circuit court had strong grounds to reject this claim without holding an evidentiary hearing. If the court had consulted CCAP for the case Smith cited from CCAP, it would have immediately learned that Stewart entered a plea in the Exxon case that Smith referenced in July 2015, and received a prison sentence based on that conviction, all of which occurred well in advance of the

December 2015 trial here. Therefore, the only potential content to the thinly undeveloped *Brady* claim—involving both the "pending cases" premise and the "no conviction" premise—was obviously inaccurate. Smith attempts in his reply brief to advance an entirely new set of claims that was not reflected in his postconviction motion, based on the notion that what is important is that the Exxon case was pending at the time of Stewart's *arrest* and including an entirely new claim of ineffective assistance of trial counsel. These arguments come too late. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) (we need not consider arguments developed for the first time in a reply brief).

### D. Consideration Testimony

¶58 Albeit in a somewhat confusing manner, Smith argued in his postconviction motion that it was false for Stewart to testify that he received no consideration from the State in exchange for agreeing to testify as a witness called by the State in this case. However, this argument rested on two incorrect premises and for those reasons we affirm the circuit court's rejection of this argument without holding an evidentiary hearing.

¶59 First, the argument was premised on Smith's claims involving the Exxon case, which we have just explained were directly refuted by the CCAP entries.

¶60 Second, the argument rested on the proposition that it would have been false for Stewart to testify that he received no consideration for agreeing to testify when the record supports the conclusion that Stewart entered into a favorable plea agreement to resolve the charges against him in this armed robbery case. As our discussion above makes clear, Stewart did not testify that he did not

receive a favorable plea agreement in this case; the prosecutor acknowledged this in the discussion with the court that we have summarized above and Stewart did not testify to the contrary. The circuit court did not permit Stewart to testify about the specifics of his plea deal in this case. Instead, Stewart testified that he did not receive any benefit based on a specific agreement with the State that he would testify as a witness called by the State at trial. In sum, Smith's motion does not allege facts on this topic which, if true, show that Stewart testified falsely.

## CONCLUSION

¶61     For all of these reasons, we affirm the circuit court's order denying the postconviction motion without holding an evidentiary hearing.

*By the Court*.—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.